**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CENTRAL MIDWEST REGIONAL COUNCIL OF CARPENTERS WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE KROGER CO.,<br><br>Defendant | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Third Party Payor Central Midwest Regional Council of Carpenters Welfare Fund ("Central Midwest" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, make the following allegations pursuant to the investigation of its counsel and based upon information and belief, except as to allegations specifically pertaining to itself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff alleges that Defendant The Kroger Co. ("Kroger" or "Defendant") engaged in a fraudulent, unfair, and deceptive pricing scheme to overcharge third-party payors ("TPPs"), like Central Midwest, on purchases of prescription medications sold to its beneficiaries and others throughout the United States. Specifically, as discussed below, Kroger inflated the prices at which it sold prescription drugs by falsely reporting its "usual and customary" ("U&C") prices at amounts that were higher than what it sold those same medications through Kroger's Health Savings Club, formally known as the Rx Savings Club (collectively "RxSC").

2. About 90% of all United States citizens are now enrolled in private or public health insurance plans that cover at least a portion of the costs of medical and prescription drug benefits.[1] A feature of most of these health insurance plans is the shared cost of prescription drugs. Typically, when a consumer fills a prescription for a medically necessary prescription drug under his or her health insurance plan, the TPP pays a portion of the cost, and the consumer pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or coinsurance or deductible payment.

3. A pharmacy cannot charge to a consumer or report to a TPP a higher price for prescription drugs than the pharmacy's U&C price. The U&C price is referred to by Kroger and known throughout the pharmacy industry as the lowest price that the pharmacy charges the cash-paying public. Indeed, Kroger's practices violate federal and state regulations, including the Medicare Prescription Drug Benefit Manual, which defines the "usual and customary price" as "the price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." 42 C.F.R. §423.100.

4. Kroger deceived Plaintiff and Class members by reporting U&C prices above the RxSC prices (which are, by definition, prices offered to cash-paying customers) and then charging Plaintiff and Class members inflated amounts. As set forth below, Kroger's actions caused Plaintiff to pay tens, if not hundreds of thousands of dollars more than it otherwise would have had Kroger properly included its RxSC prices in determining the U&C prices and in calculating the amounts Plaintiff was required to pay.

---

[1] Stephanie Marken, *U.S. Uninsured Rate at 11%, Lowest in Eight-Year Trend*, GALLUP, (Apr. 7, 2016), http://www.gallup.com/poll/190484/uninsured-rate-lowest-eight-year-trend.aspx [https://perma.cc/45HE-56VX].

5. Because the U&C price is the price that is offered to those without insurance, TPPs like Plaintiff should not pay more than the U&C price. However, Kroger failed to include its RxSC prices when reporting its U&C prices, thereby causing Plaintiff and other TPPs to pay more than Kroger's RxSC prices for brand and generic prescription drugs—resulting in direct financial harm to Plaintiff and other similarly situated TPPs.

6. Central Midwest brings this action on behalf of itself and a class of TPPs who paid or reimbursed more for prescription drugs from Defendant than they would have absent Defendant's misconduct alleged herein.

## **PARTIES**

7. Plaintiff Central Midwest Regional Council of Carpenters Welfare Fund ("Central Midwest") f/k/a the Ohio Carpenters Health Fund ("Ohio Carpenters") and the Indiana Kentucky Ohio Regional Council of Carpenters ("IKORCC") is the Voluntary Employee Benefit Association established in accordance with LMRA §302(c)(5), 29 U.S.C. §186(c)(5), and as defined by §§1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq*. As such, Central Midwest is an entity entitled to bring suit in its own name pursuant to 29 U.S.C. §1132(d). On January 1, 2025, Central Midwest was formed by the merger of IKORCC into Ohio Carpenters.

8. Plaintiff provides benefits for its Participants and Beneficiaries ("Beneficiaries" or "Insureds") of the Central Midwest Regional Council of Carpenters Union ("Union"), which is a collective of skilled tradespeople of over 37,000 professionals across 33 local unions located in Ohio, Indiana, Kentucky, and parts of Tennessee. Central Midwest is presently located at 771 Greenwood Springs Drive, Greenwood, Indiana. Prior to January 1, 2025, and during the majority of the relevant time period, Ohio Carpenters was located at 1099 Arlington Street, Columbus,

Ohio.  Central Midwest maintains six Council Hubs in Columbus, Canton, Cleveland, Monroe, Rossford and Youngstown.  Central Midwest maintains fifteen Local Union offices in Ohio, with additional Local Union offices located in Indiana, Kentucky, and parts of Tennessee.

9.      Central Midwest's Insureds are located throughout the United States.  Central Midwest is a self-funded group health plan providing medical and welfare benefits for its Insureds and directly pays for all or a portion of its Insureds' healthcare costs, including, but not limited to, prescription costs.

10.      ERISA §404(a)(1)(A), requires plan fiduciaries, i.e., Trustees of Central Midwest, to act solely in the interest of participants and beneficiaries, for the "exclusive purpose" of providing benefits and defraying reasonable administrative expenses.  During the Class Period, Central Midwest paid or reimbursed its beneficiaries for tens of thousands of medically necessary prescriptions at inflated U&C prices in Ohio, Indiana, Kentucky, Michigan, Florida, Nevada, North Carolina, California, South Carolina, Tennessee, Georgia, West Virginia, and elsewhere. Central Midwest is ultimately at risk and responsible for reimbursing or paying for beneficiaries' purchases of prescription drugs.  Central Midwest paid more for prescriptions than it would have absent Defendant's misconduct.

11.      Through its fraudulent pricing scheme, Defendant has overcharged Central Midwest, and as a result, Central Midwest has overpaid for prescriptions.  Examples of overpayments by Central Midwest from December 9, 2018 through December 31, 2025 are indicated in the chart below.

4

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 12/31/2018 | METHYLPREDNISOLONE 4 MG DOSEPK | $13.49 | $10.00 | $8.00 | $15.49 |
| 1/1/2020 | OXYCODONE HCL (IR) 10 MG TAB | $19.82 | $20.00 | $12.77 | $27.05 |
| 1/2/2020 | AMOX-CLAV 875-125 MG TABLET | $10.40 | $20.00 | $12.00 | $18.40 |
| 1/2/2020 | SUBOXONE 8 MG-2 MG SL FILM | $249.21 | $40.00 | $70.34 | $218.87 |
| 1/3/2020 | BUPRENORPHINE 8 MG TABLET SL | $71.64 | $20.00 | $35.22 | $56.42 |
| 1/3/2020 | BUPRENORPHINE-NALOX 8-2 MG TAB | $362.09 | $20.00 | $23.22 | $358.87 |
| 1/3/2020 | OSELTAMIVIR PHOS 75 MG CAPSULE | $42.66 | $20.00 | $10.02 | $52.64 |
| 1/3/2020 | CLOBETASOL 0.05% SOLUTION | $42.49 | $20.00 | $6.00 | $56.49 |
| 1/4/2020 | DESVENLAFAXINE SUCCNT ER 100MG | $43.17 | $20.00 | $41.02 | $22.15 |
| 1/9/2020 | ESTROGEN-METHYLTESTOS F.S. TAB | $44.96 | $18.00 | $12.00 | $50.96 |
| 1/16/2020 | SUPREP BOWEL PREP KIT | $60.05 | $40.00 | $71.01 | $29.04 |
| 1/21/2020 | VENTOLIN HFA 90 MCG INHALER | $14.64 | $40.00 | $52.83 | $1.81 |
| 1/25/2020 | LIDOCAINE 5% PATCH | $59.67 | $20.00 | $22.09 | $57.58 |

5

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 1/25/2020 | ATOMOXETINE HCL 60 MG CAPSULE | $91.34 | $20.00 | $27.67 | $83.67 |
| 2/5/2020 | ACITRETIN 10 MG CAPSULE | $937.92 | $20.00 | $173.93 | $783.99 |
| 2/7/2020 | METHYLPHENIDATE ER(CD) 20MG CP | $37.13 | $20.00 | $31.67 | $25.46 |
| 2/12/2020 | CLOBETASOL 0.05% SOLUTION | $42.49 | $20.00 | $6.00 | $56.49 |
| 2/20/2020 | ADDERALL XR 10 MG CAPSULE | $189.49 | $20.00 | $17.87 | $191.62 |
| 2/23/2020 | CLINDAMYCIN HCL 300 MG CAPSULE | $19.99 | $20.00 | $8.00 | $31.99 |
| 2/24/2020 | ACYCLOVIR 5% OINTMENT | $40.14 | $20.00 | $27.10 | $33.04 |
| 2/24/2020 | ADAPALENE 0.1% CREAM | $191.45 | $20.00 | $67.42 | $144.03 |
| 3/5/2020 | KETOCONAZOLE 2% CREAM | $27.35 | $20.00 | $9.80 | $37.55 |
| 3/10/2020 | ALBUTEROL HFA 90 MCG INHALER | $40.83 | $20.00 | $8.00 | $52.83 |
| 3/13/2020 | HUMALOG 100 UNIT/ML KWIKPEN | $64.25 | $25.00 | $32.70 | $56.55 |
| 3/13/2020 | GUANFACINE HCL ER 1 MG TABLET | $2.45 | $20.00 | $6.00 | $16.45 |
| 3/13/2020 | HYDROCORTISONE 2.5% CREAM | $22.48 | $20.00 | $3.00 | $39.48 |

6

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 3/19/2020 | CLOBETASOL 0.05% SOLUTION | $42.49 | $20.00 | $6.00 | $56.49 |
| 3/24/2020 | CLOBETASOL 0.05% SOLUTION | $42.49 | $20.00 | $6.00 | $56.49 |
| 4/30/2020 | DEXMETHYLPHENIDATE ER 20 MG CP tablets 500mg/125mg | $143.34 | $20.00 | $85.26 | $78.08 |
| 5/6/2020 | APRISO ER 0.375 GRAM CAPSULE | $479.58 | $20.00 | $114.63 | $384.95 |
| 5/28/2020 | DICYCLOMINE 20 MG TABLET | $4.51 | $20.00 | $6.00 | $18.51 |
| 6/1/2020 | GUANFACINE HCL ER 1 MG TABLET | $2.45 | $20.00 | $6.00 | $16.45 |
| 6/4/2020 | ACAMPROSATE CALC DR 333 MG TAB | $113.95 | $20.00 | $78.96 | $54.99 |
| 6/18/2020 | FLUCONAZOLE 200 MG TABLET | $2.82 | $20.00 | $3.00 | $19.82 |
| 6/19/2020 | VENTOLIN HFA 90 MCG INHALER | $14.64 | $40.00 | $52.83 | $1.81 |
| 7/1/2020 | CLOBETASOL 0.05% SOLUTION | $42.49 | $20.00 | $6.00 | $56.49 |
| 7/8/2020 | ELETRIPTAN HBR 20 MG TABLET | $59.14 | $20.00 | $26.08 | $53.06 |
| 7/8/2020 | ZOLMITRIPTAN 5 MG TABLET | $34.92 | $20.00 | $22.83 | $32.09 |
| 7/9/2020 | HEATHER 0.35 MG TABLET | $11.75 | $0.00 | $9.00 | $2.75 |

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 8/13/2020 | METHYLPREDNISOL ONE 4 MG DOSEPK | $3.49 | $20.00 | $8.00 | $15.49 |
| 8/24/2020 | AZITHROMYCIN 200 MG/5 ML SUSP | $28.05 | $20.00 | $11.43 | $36.62 |
| 8/25/2020 | DULOXETINE HCL DR 30 MG CAP | $8.83 | $0.00 | $6.00 | $2.83 |
| 9/1/2020 | POTASSIUM CITRATE ER 10 MEQ TB | $34.49 | $20.00 | $14.04 | $40.45 |
| 9/1/2020 | PREDNISOLONE AC 1% EYE DROP | $12.46 | $20.00 | $5.22 | $27.24 |
| 9/15/2020 | LATUDA 60 MG TABLET | $588.08 | $40.00 | $391.48 | $236.60 |
| 10/5/2020 | ADVAIR 100-50 DISKUS | $290.57 | $20.00 | $92.50 | $218.07 |
| 10/6/2020 | CELECOXIB 200 MG CAPSULE | $3.60 | $20.00 | $6.00 | $17.60 |
| 10/13/2020 | METOPROLOL SUCC ER 100 MG TAB | $11.19 | $20.00 | $6.00 | $25.19 |
| 10/19/2020 | HEATHER 0.35 MG TABLET | $9.75 | $0.00 | $9.00 | $0.75 |
| 11/9/2020 | CELECOXIB 200 MG CAPSULE | $3.60 | $20.00 | $6.00 | $17.60 |
| 11/20/2020 | VYVANSE 20 MG CAPSULE | $272.51 | $40.00 | $266.91 | $45.60 |
| 11/28/2020 | CYCLOBENZAPRINE 10 MG TABLET | $3.87 | $0.00 | $3.00 | $0.87 |
| 12/9/2020 | SUBOXONE 8 MG-2 MG SL FILM | $295.03 | $40.00 | $70.34 | $264.69 |

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 12/10/2020 | CELECOXIB 200 MG CAPSULE | $3.60 | $20.00 | $6.00 | $17.60 |
| 12/13/2020 | ACETAZOLAMIDE 125 MG TABLET | $31.17 | $20.00 | $29.15 | $22.02 |
| 12/31/2020 | CELECOXIB 200 MG CAPSULE | $3.60 | $20.00 | $6.00 | $17.60 |
| 3/13/2025 | METHYLPREDNISOL ONE 4 MG DOSEPK | $3.48 | $10.00 | $8.00 | $5.48 |
| 3/31/2025 | AMOX-CLAV 875-125 MG TABLET | $14.09 | $20.00 | $12.00 | $22.09 |
| 4/1/2025 | METHYLPREDNISOL ONE 4 MG DOSEPK | $3.48 | $10.00 | $8.00 | $5.48 |
| 7/29/2025 | KETOCONAZOLE 2% CREAM | $38.02 | $10.00 | $9.80 | $38.22 |
| 8/4/2025 | ALBUTEROL HFA 90 MCG INHALER | $0.18 | $20.00 | $8.00 | $12.18 |
| 8/5/2025 | BUPRENORPHINE-NALOX 8-2 MG TAB | $98.97 | $20.00 | $23.22 | $95.75 |
| 8/23/2025 | METHYLPHENIDATE ER 36 MG TAB | $26.69 | $20.00 | $44.25 | $2.44 |
| 9/2/2025 | BUPRENORPHINE-NALOX 8-2 MG TAB | $98.97 | $20.00 | $23.22 | $95.75 |
| 9/18/2025 | BUPRENORPHINE 8 MG TABLET SL | $23.21 | $20.00 | $23.22 | $19.99 |
| 9/26/2025 | PREDNISOLONE AC 1% EYE DROP | $14.41 | $20.00 | $5.22 | $29.19 |
| 9/30/2025 | BUPRENORPHINE-NALOX 8-2 MG TAB | $98.97 | $20.00 | $23.22 | $95.75 |

9

| Date Purchased | Drug | TPP Paid | Copayment | Kroger RxSC Price | Overcharge |
|---|---|---|---|---|---|
| 10/2/2025 | DESVENLAFAXINE SUCCNT ER 50MG | $37.81 | $50.00 | $41.02 | $46.79 |
| 11/3/2025 | ERYTHROMYCIN 0.5% EYE OINTMENT | $7.77 | $20.00 | $10.76 | $17.01 |
| 11/11/2025 | BUPRENORPHINE 8 MG TABLET SL | $52.76 | $20.00 | $35.22 | $37.54 |
| 11/13/2025 | ALBUTEROL HFA 90 MCG INHALER | $3.61 | $20.00 | $8.00 | $15.61 |
| 12/1/2025 | DEXTROAMP-AMPHETAMIN 20 MG TAB | $22.02 | $20.00 | $16.10 | $25.92 |
| 12/9/2025 | ALBUTEROL HFA 90 MCG INHALER | $9.59 | $20.00 | $8.00 | $21.59 |
| 12/16/2025 | PREDNISOLONE AC 1% EYE DROP | $16.90 | $20.00 | $5.22 | $31.68 |
| 12/21/2025 | AZITHROMYCIN 200 MG/5 ML SUSP | $12.41 | $20.00 | $7.29 | $25.12 |
| 12/21/2025 | OSELTAMIVIR 6 MG/ML SUSPENSION | $45.11 | $20.00 | $30.06 | $35.05 |
| 12/25/2025 | AMOX-CLAV 600-42.9 MG/5 ML SUS | $50.40 | $20.00 | $12.00 | $58.40 |

12.     Defendant The Kroger Co. is an Ohio corporation with its principal place of business at 1014 Vine Street, Cincinnati, Ohio.  Defendant owns and operates over 2,300 pharmacies at supermarkets with various brand names, including but not limited to, Kroger, Ralphs, and Smith's.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and Kroger is citizen of a state different than Plaintiff.  Moreover, Kroger's wrongful conduct, as described herein, foreseeably affected TPPs in Ohio and nationwide.  This Court also has subject matter jurisdiction over Plaintiff's and the Class's claims pursuant to 28 U.S.C. §1367(a).

14.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in Ohio and it conducts substantial business within Ohio such that Defendant has significant, continuous, and pervasive contacts with the State of Ohio.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendant is headquartered in this District, it does substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## COMMON FACTUAL ALLEGATIONS

I.      **HEALTH INSURANCE AND PRESCRIPTION DRUG BENEFITS IN THE UNITED STATES**

16.     The vast majority of Americans have a health insurance plan (either private or public) that covers at least a portion of their medical and prescription drug expenses.

17.     Health insurance is paid for by a premium that covers medical and prescription drug benefits for a defined period.  Health insurance can be purchased directly by an individual or obtained through employer plans that either provide benefits by purchasing group insurance policies or are self-funded but administered by health insurance companies and their affiliates. Consumers pay premiums to receive their health insurance benefits.

11

18. If a health insurance plan covers outpatient prescription drugs, the cost for prescription drugs is often shared between the consumer and the third-party payor. Such cost sharing can take the form of deductible payments, coinsurance payments, or copayments. In general, deductibles are the dollar amounts the consumer pays during the benefit period (usually a year) before the health insurance plan starts to make payments for drug costs. Coinsurance generally requires a consumer to pay a stated percentage of drug costs. Copayments are generally fixed dollar payments made by a consumer toward drug costs.

19. Consumers purchase health insurance and enroll in employer-sponsored health insurance plans to protect them from unexpected high medical costs, including prescription drug costs. Given the premiums paid in exchange for health insurance benefits (including prescription drug benefits), consumers expect to pay the same price as or less than the price paid by uninsured or cash-paying individuals for a prescription. Otherwise, consumers not only would receive no benefit from their prescription drug benefits, but, in fact, would be punished for having health insurance. Therefore, Plaintiff and the Class reasonably expected to pay the same or less for RxSC drugs than cash-paying customers enrolled in the RxSC program.

20. Generic versions of brand name drugs typically are priced significantly below the brand name versions. Thus, as part of the cost-sharing structure relating to prescription drug benefits, third-party payors frequently encourage or require plan participants to have their prescriptions filled with generics in an effort to save on skyrocketing prescription drug costs. Generics typically provide consumers with a lower-cost alternative to brand name pharmaceuticals while providing the same treatment. Here, Plaintiff and the Class should not have paid more than cash-paying customers.

## II.   STANDARDIZED PRESCRIPTION CLAIMS ADJUDICATION PROCESS

21.   The prescription claims adjudication process, which is the process of accepting or denying prescription claims submitted to a third-party payor, is a systematic, standardized, electronic process used throughout the pharmaceutical industry.

22.   This uniform process is derived from National Council for Prescription Drug Programs[2] ("NCPDP") industry standards for the electronic transmission and adjudication of pharmacy claims.   NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services.[3]   The NCPDP standards have been adopted in federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), Medicare Modernization Act ("MMA"), Health Information Technology for Economic and Clinical Health ("HITECH"), and Meaningful Use ("MU").   For example, HIPAA requires uniform methods and codes for exchanging electronic information with health insurance plans. These standards are referred to as the NCPDP Telecommunications Standard.   HIPAA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D.  42 C.F.R. §423.160.

---

[2]   NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services.  Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.

[3]   NCPDP, *Who We Are*, NCPDP: WHO WE ARE, https://www.ncpdp.org/Who-We-Are.aspx [https://perma.cc/9K8K-B5FH] (last visited Mar. 18, 2026).

23.     The NCPDP sets industry standards for the electronic transmission of pharmacy claims to TPPs.  Kroger follows this uniform process at its pharmacies for each prescription drug transaction.

24.     When a consumer presents a prescription claim at a pharmacy, key information such as the consumer's name, drug dispensed, and quantity dispensed is transmitted via interstate wire from the pharmacy to the correct third-party payor (or its agent) to process and adjudicate the claim.[4]  The third-party payor instantaneously processes the prescription claim according to the benefits plan assigned to the consumer.  The third-party payor electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and consumer are covered and, if so, the amount the pharmacy must collect from the consumer as a copayment, coinsurance, or deductible amount.  Any portion of the drug price not paid by the consumer is borne by the third-party payor.  The whole adjudication process occurs in a matter of seconds.

25.     Kroger, Plaintiff, and members of the Class all participate in this automated and systematic claims adjudication process when prescriptions are filled.

26.     When a customer fills a prescription at a Kroger pharmacy, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into Kroger's computerized claims processing system.  Kroger then submits the claim to the NCPDP.

27.     The NCPDP provides a standardized form for Kroger to fill out and send to TPPs when filling prescriptions.  The form includes Transmission Pricing Record Field No. 426-DQ, where Kroger is required to report its "usual and customary" price of the prescription being filled.

---

[4]     A third-party payor may utilize the services of a pharmacy benefit manager ("PBM") as its agent to administer its prescription drug benefit.

The NCPDP Reference Manual on Flat File Format defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."

28. The out-of-pocket amount that TPPs and consumers are required to pay (whether in the form of a cost share, copayment, coinsurance, or deductible amount) in order to receive the prescription is calculated based on the U&C price reported by Kroger. The out-of-pocket amount that a TPP and consumer pay cannot exceed the U&C price. The drug reimbursement amount reported to third-party payors also cannot exceed the U&C price. Thus, the price reported and charged to Plaintiff and the Class cannot exceed the U&C price. Upon information and belief, Kroger uniformly administers its U&C pricing scheme such that it uses the same inflated "U&C" price for a particular RxSC medication that it reports and charges to Plaintiff and the Class.

III. **PHARMACIES ARE REQUIRED TO REPORT THE CASH PRICE FOR THE DRUG BEING DISPENSED AS THEIR U&C PRICE**

29. As part of the adjudication process, the pharmacy must report the pharmacy's U&C price for the drug being dispensed. Pharmacies are required to report their U&C prices for each prescription transaction using NCPDP's mandatory pricing segment code 426-DQ.[5]

30. The term "usual and customary" is not ambiguous. The U&C price submitted in the adjudication process is generally defined as the cash price to the general public, exclusive of

---

[5] NCPDP, Telecommunication Version D and Above: Questions, Answers and Editorial Updates at 44 (Dec. 2025), https://member.ncpdp.org/Member/media/pdf/VersionDQuestions.pdf [https://perma.cc/G9BE-7YVA].

15

sales tax or other amounts claimed.[6]  The following sources, among others, reflect the commonly accepted industry meaning of the term "usual and customary" price:

31.    The NCPDP, which created standard billing forms used for drug claims, is a standard-setting organization that represents virtually every sector of the pharmacy services industry.  NCPDP authored explanatory materials for its billing forms that state that the "usual and customary" charge field on the billing form (field 426-DQ) means "amount charged cash customers for the prescription."[7]  Congress authorized the Secretary of HHS to "adopt" standard billing forms (42 U.S.C. §1320d-1(a)), and, under that authority, the Secretary "adopted" the current NCPDP electronic form as the standard electronic health care claim form.  45 C.F.R. §162.1102(a).  *See also* 42 C.F.R. §423.160 (incorporating NCPDP standards into the Medicare Part D program).

32.    The Academy of Managed Care Pharmacy ("AMCP") is a professional association that includes health systems and pharmacy benefit managers ("PBMs").  An AMCP Guide to Pharmaceutical Payment Methods (October 2007) defines "usual and customary" price as "[t]he price for a given drug or service that a pharmacy would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the

---

[6]    *See, e.g.,* Illinois Department of Healthcare and Family Services, Handbook for Providers of Pharmacy Services (Chapter P-200 Policy and Procedures For Pharmacy Services Mar. 2016) https://hfs.illinois.gov/content/dam/soi/en/web/hfs/sitecollectiondocuments/p200.pdf [https://perma.cc/C2RA-QED8].

[7]    NCPDP, NCPDP EMERGENCY PREPAREDNESS GUIDANCE at 66 (Version 1.12 Nov. 2021) https://ncpdp.org/NCPDP/media/pdf/Resources/NCPDPEmergencyPreparednessInformation.pdf ?ext=.pdf [https://perma.cc/87VT-ASMA].

pharmacy."[8] The Pharmaceutical Care Management Association, a national association dedicated to representing pharmacy benefit managers, utilizes a similar definition.

33. Several reports by the Government Accountability Office on "usual and customary" price trends in drug pricing, issued from August 2005 through February 2011, define the "usual and customary price" as "the price an individual without prescription drug coverage would pay at a retail pharmacy." *See, e.g.,* U.S. GOV'T ACCOUNTABILITY OFF., GAO-11-306R, PRESCRIPTION DRUGS: TRENDS IN USUAL AND CUSTOMARY PRICES FOR COMMONLY USED DRUGS (Feb. 10, 2011).

34. The Department of Health & Human Services, Centers for Medicare & Medicaid Services issued a Memorandum regarding Part D beneficiaries and lower cash prices. Specifically, the Memorandum noted that "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price."[9]

35. The Code of Federal Regulations and the Medicare Prescription Drug Benefit Manual (Chapter 5, §10.2, Benefits and Beneficiary Protections: Definition of Terms, Rev. 9/30/11) define usual and customary price as "[t]he price that an out-of-network pharmacy or a

---

[8] AMCP, AMCP Guide to Pharmaceutical Payment Methods at 57 (Comprehensive ed. Version 1.0 Oct. 2007) (https://perma.cc/6XVF-5TDT).

[9] Memorandum from the Centers for Medicare & Medicaid Services on HPMS Q & A - Lower Cash Price Policy (Oct. 11, 2006) (https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf [https://perma.cc/NBS7-R4UK]).

physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." 42 C.F.R. §423.100.

## IV. OTHER PHARMACIES AND PBMS REPORT THEIR PRESCRIPTION DRUG DISCOUNT PROGRAM PRICES AS THEIR U&C PRICES

36.     Because of the price differentials, generic versions of prescription drugs are liberally and substantially substituted for their brand name counterpart. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand name product unless the doctor has indicated that the prescription for the brand name product must be dispensed as written. Today, nearly 89% of all prescriptions are filled with generic drugs.

37.     In 2006, the major retailers with pharmacy departments began offering hundreds of generic prescription drugs at reduced prices. These retailers were likely able to absorb lower margins on generic drug sales because pharmacy sales represented a low percentage of their total sales.

38.     For example, in September 2006, Walmart began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply. In November of that same year, Target began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.[10] Upon information and belief, Walmart and Target report to health insurance plans their $4 per 30-day supply for generic prescription drugs as their U&C prices.

39.     Shortly after the implementation of these programs, the Centers for Medicare & Medicaid Services ("CMS") offered guidance on the lower cash prices pharmacies were offering

---

[10]     Reuters, *Target Expands $4 Program on Generics to All Pharmacies*, THE NEW YORK TIMES (Nov. 21, 2006), http://www.nytimes.com/2006/11/21/business/21drug.html [https://perma.cc/3GCS-Y2VE].

on generic prescriptions.[11] In the October 11, 2006 guidance, CMS was careful to note the following:

> Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefiting from the Wal-Mart "usual and customary" price.[12]

40. This definition of "usual and customary" price is followed by PBMs. For instance, Express Scripts, Inc., a PBM that includes Kroger in its network, defines the "Usual and Customary Retail Price" in its Pharmacy Network Manual as "[t]he usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, *including any discounts* or special promotions offered on such date." Another large PBM, Prime Therapeutics LLC, which also includes Kroger in its network, defines "Usual and Customary Charge" in its Pharmacy Provider Manual as "the lowest price the Participating Pharmacy would charge to a particular [customer] if that customer [were] paying cash for the identical Prescription Drug Services on the date dispensed. *This includes any applicable discounts including*, but not limited to, senior discounts,

---

[11] Memorandum from the Centers for Medicare & Medicaid Services on HPMS Q & A - Lower Cash Price Policy, *supra* note 9.

[12] *Id.* at 1 n.1.

*frequent shopper discounts* and other special discounts offered to attract customers." Membership fees for savings clubs, if any, are not supposed to be factored into the U&C price.

41. Based on the U&C price that Kroger reports on the NCPDP's standard form, the appropriate copayment amount is calculated and Kroger charges that amount to the customer directly for that portion of the transaction.

42. The amount of the copayment and amount paid by the TPP cannot exceed the U&C price. This pricing structure matches consumers' and TPP's expectations. Participants in private or public healthcare plans reasonably expect to pay less than cash-paying customers who do not have insurance coverage. Otherwise, not only would beneficiaries receive no benefit from their insurance and TPPs no benefit for their purchase of prescription drug coverage, but they would, in fact, be punished for having insurance.

43. In 2018, Kroger launched Kroger's RxSC. The RxSC provides deep discounts to cash purchasers on many commonly prescribed generic and brand name drugs. Specifically, through the RxSC, Kroger offered 30-day prescriptions of many generic drugs for $3.00, $6.00, or even for free, 90-day prescriptions for $6.00 and $12.00, as well as discounted prices off of brand name drugs. From 2018 through mid-2023, the RxSC was administered through GoodRx. In approximately July 2023, Kroger replaced GoodRx with RxSense as the administrator of the RxSC and renamed the Kroger Prescription Savings Club to the Kroger Health Savings Club.[13] Although Kroger renamed the RxSC, the pattern of conduct engaged in by Kroger under the Prescription Savings Club continued with the renaming of the program to Health Savings Club.

---

[13] Press Release, The Kroger Co., Kroger Health Launches Revamped Savings Program to Bring Value to Customers (July 26, 2023) (https://ir.kroger.com/news/news-details/2023/Kroger-Health-Launches-Revamped-Savings-Program-to-Bring-Value-to-Customers/default.aspx).

44. Under the RxSC, most of Kroger's cash-paying customers paid the RxSC price. Thus, the RxSC price is the price at which Kroger sells prescriptions to cash-paying customers as the U&C price. As such, Kroger is required to include its RxSC prices in reporting its U&C prices, which is what other national retail pharmacies such as Walmart and Costco do.

45. But Kroger listed its inflated non-RxSC prices as its U&C prices and charged Plaintiff and the Class more than RxSC prices in an effort to bolster its profits. Kroger routinely sold generic medications at $6, $3, or even for free, and offered significant discounts on brand name drugs, but it reported to consumers, TPPs, and the NCPDP that the U&C for these medications were actually much higher than the RxSC prices.

46. Kroger's RxSC provided customers with exclusive access to discounts on commonly-prescribed generic medications for widespread conditions in the United States, including diabetes, asthma, mental health issues, women's health concerns, and gastrointestinal and heart health. The program claimed to lower the price of these and many other medications, providing up to 85% savings on thousands of prescriptions.

47. Because these discounts were so attractive, most of Kroger's cash-paying customers paid the RxSC price. In other words, the RxSC price should have been the U&C price at which Kroger sold all of its prescriptions. Instead, Kroger charged insured TPPs and consumers higher prices than its RxSC prices.

48. By way of example, Kroger listed the U&C price for 30 200 mg capsules of Celecoxib as $190.98 even though it routinely sold the same prescription for just $6.00.

21



49.     As a result, Plaintiff and the Class (who pay for beneficiaries with insurance) ended up paying far more than they should have.  Participants in high-deductible plans can end up paying the full amount each month, for a total of $2,291.76 per year.  Consumers with a copayment of $10.00 end up paying $120.00 per year—which does not include the additional costs paid by TPPs.  But the price charged should be no more than $72 per year: $6.00 per month at the RxSC price.

50.     Similarly, Kroger listed the U&C price for 90 20 mg tablets of Atorvastatin at $109.04 even though it routinely sold the same prescription for just $12.00.



51.     As a result, again, consumers with insurance ended up paying far more than they should have, and TPPs paid or reimbursed more for prescriptions than they should have.

Participants in high-deductible plans ended up paying the full amount every three months, for a total of $1,308.48. Consumers with a copayment of $10.00 ended up paying $120.00 per year. Both should have paid no more than $48.00: $12.00 at the RxSC price every three months. Other examples abound.

52. The relationship between a pharmacy and its customers is unique, special, and important. Pharmacists, including those at Kroger, do more than just dispense medicine. Pharmacists discuss with customers how they should take medications, counsel customers on the use of medicine (whether over-the-counter or prescription), and advise customers on general health topics, such as diet and exercise. Trust is an essential component of the relationship between a pharmacist and a customer. For instance, a customer needs to trust a pharmacist that a generic drug is just as effective as its brand-name counterpart. Indeed, customers have come to expect such advice, and further, that pharmacists will provide them with ways to save money, such as using generics when available, without prompting.

53. Kroger has acknowledged this special relationship. On its website, Kroger previously noted that its pharmacists "provide more than just prescriptions and over-the-counter medications; they provide advice and support . . . ." In addition, Kroger touted that its pharmacists "provide more than just medication expertise — they're dedicated to helping you stay healthy and happy with a full range of Convenience Tools, Saving Programs & Personalized Health Services."

<u>**CLASS ACTION ALLEGATIONS**</u>

54. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of itself and the following Classes:

> **Nationwide Class (Counts I – II):** All entities in the United States and its territories who, from December 12, 2018 through the present (the "Class Period"), paid, in full or in part, for a prescription drug purchased at a pharmacy owned by The Kroger Co. for consumption by their members, employees, insureds,

23

participants, or beneficiaries (the "Class") where the price paid exceeded the RxSC Club Price.

**OR IN THE ALTERNATIVE**

**State Classes (Counts III – XI):** All entities in Ohio, Indiana, Kentucky, Michigan, Florida, Nevada, North Carolina, California, South Carolina, Tennessee, Georgia, New York, and West Virginia, who, from December 12, 2018 through the present (the "Class Period"), paid in full or in part, for a prescription drug purchased at a pharmacy owned by The Kroger Co., for consumption by their members, employees, insureds, participants, or beneficiaries where the price paid exceeded the RxSC Club price.

55.     Excluded from each Class is:

    a.     The Defendant, any entity which it owns or controls, including any subsidiaries, affiliates, and assigns;

    b.     All federal and state governmental entities, excluding governmental-funded employee benefit plans;

    c.     All PBMs and other entities who purchased prescription drugs from Kroger for purposes of resale; and

    d.     Any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

56.     Subject to additional information obtained through discovery, the foregoing class definitions may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

57.     **Numerosity:** At this time, Plaintiff does not know the exact number of members of the aforementioned Nationwide Class and State Classes ("Class members" and "State Class Members," respectively, together, "Classes"); however, given the nature of the claims and the number of pharmacies in the United States that Kroger owns and operates, Plaintiff believes that

24

Class members and State Class Members are so numerous that joinder of all members is impracticable.

58. **Common Questions of Law and Fact Predominate:** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of both Classes include:

   a.    whether Kroger misrepresented their U&C prices;

   b.    whether Kroger overcharged Plaintiff and Class members and State Class Members;

   c.    whether Kroger's conduct was unfair and/or deceptive;

   d.    whether Kroger has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiff and the Nationwide Class and/or State Classes;

   e.    whether Plaintiff and the Nationwide Class and/or State Classes have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

59. **Typicality:** Plaintiff's claims are typical of those of the Nationwide Class and State Classes because Plaintiff, like all members of the Nationwide Class and State Classes, purchased generic prescription medication from Kroger on behalf of its insured beneficiaries and, as a result, was charged more than the prices under the RxSC.

60. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Nationwide Class and State Classes and has retained counsel that is experienced in litigating

25

complex class actions.  Plaintiff has no interests that conflict with those of the Nationwide Class or the State Classes.

61.     **Superiority of Class Action:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

62.     The prosecution of separate actions by members of the Nationwide Class and the State Classes would create a risk of establishing inconsistent rulings, and/or incompatible standards of conduct.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Nationwide Class and the State Classes even where certain Class members or State Class Members are not parties to such actions.

## TOLLING OF THE STATUTE OF LIMITATIONS

63.     Plaintiff, Class members, and State Class Members had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

64.     Plaintiff, Class members, and State Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

65.     Kroger's pricing scheme did not reveal facts that would have put Plaintiff or Class members or State Class Members on notice that Kroger was reporting and charging inflated prices for prescription drugs in Kroger's RxSC.  Kroger misrepresented at the point of purchase that the copayment was accurate; and Kroger omitted at the point of purchase that Plaintiff was not receiving any benefit from its beneficiary having insurance.

66.     Because Kroger did not disclose the pricing scheme, Plaintiff, Class members, and State Class Members were unaware of Kroger's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for prescription drugs in Kroger's RxSC.

67.     Not only did Kroger fail to disclose material information, but it also actively misled TPPs and consumers by inflating and misrepresenting U&C prices for prescription drugs in Kroger's RxSC to Plaintiff that were far higher than the actual U&C prices. Kroger also failed to post drug prices in a clear manner and in a way that would alert Plaintiff, Class members, and State Class Members to the artificially inflated prices charged by Kroger. By so doing, Kroger misled Plaintiff, Class members, and State Class Members into overpaying for prescription drugs in Kroger's RxSC.

68.     Kroger's affirmative acts alleged herein, including acts in furtherance of its unlawful pricing scheme, were wrongfully concealed and carried out in a manner that precluded detection.

69.     Under the circumstances alleged, Kroger owed a duty to Plaintiff, Class members, and State Class Members to provide them with accurate information regarding the prices of their generic prescription drugs.

70.     The relationship between Kroger and Plaintiff and the Classes is one in which Kroger has an obligation of reasonable conduct for the benefit of the Plaintiff and the Classes. As a pharmacy providing prescription medication to consumers which are reimbursed by TPPs, Kroger owes a duty to provide accurate information regarding the prices of generic prescription drugs, including prescription drugs in Kroger's RxSC. Furthermore, as a pharmacy, Kroger is bound to the Code of Ethics for Pharmacists, which mandates Kroger's pharmacies and the pharmacists within the pharmacies to tell the truth and to assist individuals in making the best use

of medications.[14] Plaintiff and the Classes reasonably expected Kroger to "help individuals achieve optimum benefit from their medications, to be committed to their welfare, and to maintain their trust."[15]

71. The relationship between Kroger and Plaintiff and the Classes is one in which Kroger has an obligation of reasonable conduct for the benefit of Plaintiff and the Classes. As an entity that is in the business of supplying information for the guidance of both third-party payors and consumers in their business transactions with Kroger, Kroger owes a duty to Plaintiff and the Classes to provide them with accurate information regarding the U&C price of generic prescription drugs, including prescription drugs in Kroger's RxSC.

72. Kroger also had a duty to Plaintiff and members of the Classes to provide them with accurate information regarding the prices of their generic prescription drugs because it was entirely likely and foreseeable that Plaintiff and the Classes would be injured when they paid for prescription drugs in Kroger's RxSC at amounts that were far higher than the prices they would have paid but for Kroger's misconduct. Kroger knows exactly what is required and involved in reporting U&C prices given that Kroger's own Pharmacy Manual defines U&C and the application of that definition would have required Kroger to charge the lower price to Plaintiff and the Classes. Imposing a duty to provide Plaintiff and the Classes with accurate price information places no burden on Kroger because Kroger already is required to accurately report to programs like Medicare and Medicaid its U&C price for prescriptions being dispensed and to not seek reimbursement for a prescription at a price that is inflated over the price it charges self-paying

---

[14] American Pharmacists Ass'n, *Code Of Ethics For Pharmacists*, APHA: CODE OF ETHICS, https://www.pharmacist.com/code-ethics [https://perma.cc/9PRD-V54H] (last visited Mar. 18, 2026).

[15] *Id*.

28

customers for the exact same drug (i.e., the U&C price).  *See*, *e.g.*, 31 U.S.C. §3729, *et seq.*; 42 U.S.C. §1320c-5(a)(1); 42 U.S.C. §1320a-7(b)(6); 42 C.F.R. §§423.505(i)(4)(iv), (k)(3); 42 C.F.R. §447.512(b); Cal. Welf. & Inst. Code §14105.455.

73.     Plaintiff, Class members, and State Class Members could not have discovered the alleged unlawful activities at an earlier date by exercise of reasonable diligence because Kroger employed deceptive practices and techniques of secrecy to avoid detection of its activities.  Kroger fraudulently concealed its activities by various means and methods, including misrepresentations regarding the real U&C prices of prescription drugs in Kroger's RxSC.

74.     Because Kroger affirmatively concealed its pricing scheme, Plaintiff and the Classes had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether Kroger committed the actionable activities detailed herein.

75.     As a result of Kroger's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff, Class members, and State Class Members have as a result of the unlawful conduct alleged in this Complaint.

## COUNT I
### Fraud

76.     Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

77.     Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and State Classes.

78.     Kroger materially misrepresented and concealed the true U&C prices of generic prescription drugs that are included in the RxSC program.  Kroger made misrepresentations to

Plaintiff, Class members, and State Class Members each time it charged them for copays and reimbursements that were calculated based on its inflated U&C prices.

79.     Kroger made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Kroger knew the prices that it reported to Plaintiff and the NCPDP were substantially (and unjustifiably) higher than the prices it charged under its RxSC program to cash-paying customers.

80.     Kroger intended to induce Plaintiff and other TPPs and consumers to rely on its misrepresentations and omissions.  Kroger knew that Plaintiff and other TPPs and consumers would rely on its representations and omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for generic prescription drugs.  Other indicia of intent are: (a) Kroger's practice of not factoring the RxSC price into the U&C price contravened industry standards; (b) other major industry players—such as Walmart and Costco—report their discount program prices as their U&C prices; and (c) Kroger created the RxSC program to stay competitive in the market's new discounted pricing norm while fraudulently charging third-party payors and their members a higher price.

81.     Plaintiff and other TPPs and consumers justifiably relied on Kroger's misrepresentations and omissions in that they would not have purchased generic prescription drugs from Kroger for more than the RxSC prices but for Kroger's misrepresentations and omissions. Plaintiff's and other consumers' and TPPs' reliance on Kroger's misrepresentations and omissions was, thus, to their detriment.

82.     As a proximate result of Kroger's conduct, Plaintiff and other TPPs and consumers have been damaged because they paid copayments for generic prescription drugs that were higher than the prices they would have paid but for Kroger's misconduct.

30

83. Kroger is therefore liable to Plaintiff and members of the Nationwide Class, and in the alternative, the State Classes, for the damages they sustained.

## COUNT II
### Unjust Enrichment

84. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

85. Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and State Classes.

86. To the extent required by law, this claim is alleged in the alternative, as permitted under Federal Rule of Civil Procedure 8.

87. By means of Kroger's wrongful conduct alleged herein, Kroger knowingly charges plan participants artificially high copayments for generic prescription drugs included in the RxSC in a manner that is unfair and unconscionable.

88. Kroger knowingly received and retained wrongful benefits and funds from Plaintiff, the Nationwide Class, and State Classes. In so doing, Kroger acted with conscious disregard for the rights of Plaintiff, the Nationwide Class, and State Classes.

89. As a result of Kroger's wrongful conduct as alleged herein, Kroger has been unjustly enriched at the expense of, and to the detriment of Plaintiff, the Nationwide Class, and State Classes.

90. Kroger's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

91. Under the common law doctrine of unjust enrichment, it is inequitable for Kroger to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiff, the Nationwide Class, and State Classes

31

in an unfair and unconscionable manner. Kroger's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

92. Plaintiff, the Nationwide Class, and State Classes did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Kroger to retain these wrongfully obtained proceeds.

93. Kroger is therefore liable to Plaintiff, the Nationwide Class, and in the alternative, the State Classes, for restitution in the amount of Kroger's wrongfully obtained profits.

**COUNT III**
**Violation of California's Unfair Competition Law**
**(Based on Fraudulent Acts and Practices)**
**Asserted by Plaintiff on Behalf of the California Members of the Nationwide Class**
**("California Class")**

94. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

95. Plaintiff brings this claim on behalf of itself and the members of the California Class against Kroger.

96. At all relevant times, Kroger, Plaintiff and the California Class were "persons" within the meaning of Cal. Bus. & Prof. Code §17204.

97. Under Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

98. Plaintiff and the California Class have suffered losses because of Kroger's employment of fraudulent business acts or practices in connection with the sale of prescription drugs in Kroger's RxSC to Plaintiff and the California Class, by, among other things:

32

a.  reporting to and charging Plaintiff and the California Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

b.  communicating to and charging the beneficiaries of Plaintiff and the California Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

c.  concealing from Plaintiff and the California Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the California Class should have paid; and

d.  wrongfully obtaining monies from Plaintiff and the California Class as a result of its deception.

99.  Kroger willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were fraudulent and thus in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*

100.  The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the California Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

101.  Kroger intended for Plaintiff and the members of the California Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

33

102.     As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the California Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

103.     Kroger is therefore liable to Plaintiff and the California Class for restitution, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**(Based on Unlawful Acts and Practices)**
**Asserted by Plaintiff on Behalf of the California Class**

104.     Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

105.     Plaintiff brings this claim on behalf of itself and the members of the California Class against Kroger.

106.     At all relevant times, Kroger, Plaintiff and the California Class were "persons" within the meaning of Cal. Bus. & Prof. Code §17204.

107.     The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.

108.     Kroger violated §17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating California Civil Code §§1572, 1573, 1709, 1710, 1711, 1770, California Business & Professions Code §17200, *et seq.*, the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §45(a)(1), Cal. Penal Code §550, 42 C.F.R. §447.512(b)(2), Cal. Welf. & Inst. Code §14105.455, and by violating the common law.  By violating these laws, Kroger has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

34

109.    Kroger willfully and knowingly engaged in the unlawful acts and practices alleged herein above and knew or should have known that those acts and practices were unlawful and thus in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*

110.    The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the California Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transactions but for Kroger's unlawful, deceptive, fraudulent, false, and unfair acts and practices.

111.    Kroger intended for Plaintiff and the members of the California Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's unlawful, deceptive, fraudulent, false, and unfair acts and practices.

112.    As a direct and proximate result of Kroger's unlawful, deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the California Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

113.    Kroger is therefore liable to Plaintiff and the members of the California Class for restitution, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**<u>COUNT V</u>**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**Asserted by Plaintiff on Behalf of Florida Members of the Nationwide Class ("Florida Class")**

114.    Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

115.    Plaintiff brings this claim individually and on behalf of the Florida Class Members against Kroger.

116. Plaintiff and the Florida Class are "consumers" within the meaning of Fla. Stat. §501.203(7).

117. Kroger's transactions with Plaintiff and the Florida Class as described herein occurred "in the conduct of any trade or commerce" within the meaning of Fla. Stat. §§501.202 and 501.203(8).

118. Plaintiff and the Florida Class suffered damages as a consequence of Kroger's knowing and intentional use and employment of unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce in connection with the sale of prescription drugs in Kroger's RxSC to Plaintiff and the Florida Class, including, among other things:

   a. reporting to and charging Plaintiff and the Florida Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

   b. communicating to and charging beneficiaries of Plaintiff and the Florida Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

   c. concealing from Plaintiff and the Florida Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper copayment, coinsurance, or deductible amount Kroger should have reported to and charged Plaintiff and the Florida Class; and

   d. wrongfully obtaining monies from Plaintiff and the Florida Class as a result of its deception.

119. Kroger willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were

36

unconscionable, unfair and/or deceptive and in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*

120. As a direct and proximate result of Kroger's unfair and deceptive acts and practices, Plaintiff and the Florida Class Members have paid falsely inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

121. Kroger therefore is liable to Plaintiff and the Florida Class for the damages they sustained, plus statutory damages (including treble damages), penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT VI
### Violation of Georgia's Uniform Deceptive Trade Practices Act
### Asserted by Plaintiff on Behalf of Georgia Members of the Nationwide Class ("Georgia Class")

122. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

123. Plaintiff brings this claim on behalf of itself and the members of the Georgia Class against Kroger.

124. At all relevant times, Plaintiff and the Georgia Class are "persons" within the meaning of Ga. Code Ann. §10-1-371(5).

125. Kroger's transactions with Plaintiff and the Georgia Class as described herein occurred in the course of Kroger's "business" within the meaning of Ga. Code Ann. §10-1-370, et seq.

126. Georgia's Uniform Deceptive Trade Practices Act, Ga. Code Ann. §10-1-372, prohibits "deceptive trade practices," which include "(11) Mak[ing] false or misleading statements

concerning the reasons for, existence of, or amounts of price reductions; or (12) Engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

127. Plaintiff and the Georgia Class have suffered losses because of Kroger's employment of unfair or deceptive acts or practices in the course of its business in omitting the existence of a price reduction in the sale of prescription drugs in Kroger's RxSC, by, among other things:

    a. reporting to and charging Plaintiff and the Georgia Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

    b. communicating to and charging beneficiaries of Plaintiff and the Georgia Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

    c. concealing from Plaintiff and the Georgia Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the Georgia Class should have paid; and

    d. wrongfully obtaining monies from Plaintiff and the Georgia Class as a result of its deception.

128. Kroger willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §10-1-370, *et seq.*

129. The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the Georgia Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

130.     Kroger intended for Plaintiff and the members of the Georgia Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

131.     As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the Georgia Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

132.     Kroger is therefore liable to Plaintiff and the members of the Georgia Class for the damages they sustained, plus statutory damages, penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT VII**
**Violation of Georgia's Fair Business Practices Act**
**Asserted by Plaintiff on Behalf of the Georgia Class**

133.      Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

134.     Plaintiff brings this claim on behalf of itself and the members of the Georgia Class against Kroger.

135.     At all relevant times, Plaintiff and the Georgia Class are "persons" within the meaning of Ga. Code Ann. §10-1-392(24).

136.     At all relevant and material times as described herein, Kroger was engaged "in the conduct of consumer transactions and consumer acts or practices in trade or commerce" within the meaning of Ga. Code Ann. §10-1-393(a) with respect to the acts alleged herein.

137.     The Georgia Fair Business Practices Act declares "[u]fair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or

commerce" to be unlawful, Ga. Code Ann. §10-1-393(a), including but not limited to "(11) Making false or misleading statements concerning the reasons for, existence of, or amounts of price reductions[.]"

138. Plaintiff and the Georgia Class have suffered losses because of Kroger's employment of unfair or deceptive acts or practices in the course of its business in omitting the existence of a price reduction in the sale of prescription drugs in Kroger's RxSC, by, among other things:

a. reporting to and charging Plaintiff and the Georgia Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

b. communicating to and charging beneficiaries of Plaintiff and the Georgia Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

c. concealing from Plaintiff and the Georgia Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the Georgia Class Members should have paid; and

d. wrongfully obtaining monies from Plaintiff and the Georgia Class as a result of its deception.

139. Kroger willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of the Georgia Fair Business Practices Act, Ga. Code Ann. §10-1-390, *et seq*.

140. The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the Georgia Class about whether to pay for Kroger's prescription

40

drugs in Kroger's RxSC, in that they would not have proceeded with the transactions but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

141.     Kroger intended for Plaintiff and the members of the Georgia Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

142.     As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the Georgia Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

143.     Kroger is therefore liable to Plaintiff and the members of the Georgia Class for the damages they sustained, plus statutory damages, penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT VIII**
**Violation of Nevada's Deceptive Trade Practices Act**
**Asserted by Plaintiff on Behalf of Nevada Members of the Nationwide Class ("Nevada Class")**

144.     Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

145.     Plaintiff brings this claim on behalf of itself and the members of the Nevada Class against Kroger.

146.     At all relevant times, Plaintiff and Kroger were persons within the meaning of Nev. Rev. Stat. §41.600.

147.     At all relevant times, Plaintiff and the Nevada Class were "victim[s] of consumer fraud" within the meaning of Nev. Rev. Stat. §41.600.

41

148. Plaintiff and the Nevada Class have suffered losses because of Kroger's employment of deceptive trade practices in the course of its business or occupation, as defined in Nev. Rev. Stat. §598.0915(13), in "[m]ak[ing] false or misleading statements of fact concerning the price of goods or services for sale," and in Nev. Rev. Stat. §598.0915(15), in "[k]nowingly mak[ing] any other false representation in a transaction," in connection with the sale of prescription drugs in Kroger's RxSC to Plaintiff and the Nevada Class by, among other things:

    a. reporting to and charging Plaintiff and the Nevada Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

    b. communicating to and charging beneficiaries of Plaintiff, consumers, and the Nevada Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C prices;

    c. concealing from Plaintiff and the Nevada Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the Nevada Class should have paid; and

    d. wrongfully obtaining monies from Plaintiff and the Nevada Class as a result of its deception.

149. Kroger willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. §§41.600, 598.0915.

150. The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the Nevada Class about whether to pay for Kroger's prescription

drugs in Kroger's RxSC, in that they would not have proceeded with the transactions but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

151.    Kroger intended for Plaintiff and the members of the Nevada Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

152.    As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the Nevada Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

153.    Kroger is therefore liable to Plaintiff and the members of the Nevada Class for the damages they sustained, plus statutory damages, penalties, any additional remedy available for persons over the age of 65, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT IX
### Violation of North Carolina's Unfair and Deceptive Trade Practices Act
### Asserted by Plaintiff on Behalf of North Carolina Members of the Nationwide Class
### ("North Carolina Class")

154.    Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

155.    Plaintiff brings this claim on behalf of itself and the members of the North Carolina Class against Kroger.

156.    At all relevant times, Plaintiff and the North Carolina Class are businesses injured by reason of Kroger's unfair and deceptive acts and practices within the meaning of N.C. Gen. Stat. §75-16.

43

157. At all relevant and material times as described herein, Kroger conducted commerce within the meaning of N.C. Gen. Stat. §75-1.1, and Kroger's unfair or deceptive acts or practices occur in and affect commerce.

158. Plaintiff and the North Carolina Class have suffered losses because of Kroger's employment of unfair or deceptive acts or practices in or affecting commerce, by, among other things:

      a.    reporting to and charging Plaintiff and the North Carolina Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

      b.    communicating to and charging beneficiaries of Plaintiff, consumers, and the North Carolina Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

      c.    concealing from Plaintiff and the North Carolina Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the North Carolina Class should have paid; and

      d.    wrongfully obtaining monies from Plaintiff and the North Carolina Class as a result of its deception.

159. Kroger willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1, *et seq*.

160. The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the North Carolina Class about whether to pay for Kroger's

44

prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

161. Kroger intended for Plaintiff and the members of the North Carolina Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

162. As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the North Carolina Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

163. Kroger is therefore liable to Plaintiff and the members of the North Carolina Class for the damages they sustained, plus statutory damages, penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT X**
**Violation of Ohio's Deceptive Trade Practices Act**
**Asserted by Plaintiff on Behalf of the Ohio Members of the Nationwide Class ("Ohio Class")**

164. Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

165. Plaintiff brings this claim on behalf of itself and the members of the Ohio Class against Kroger.

166. At all relevant times, Plaintiff and the Ohio Class are "persons" within the meaning of Ohio Rev. Code Ann. §4165.01(D).

167. At all relevant and material times as described herein, Kroger was engaged in "the course of [its] business" within the meaning of Ohio Rev. Code Ann. §4165.02(A) with respect to the acts alleged herein.

45

168.    Ohio Rev. Code Ann. §4165.02(A) provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following: . . . (12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions[.]"

169.    Plaintiff and the Ohio Class have suffered losses because of Kroger's employment of unfair or deceptive acts or practices in the course of its business in omitting the existence of a price reduction in the sale of prescription drugs in Kroger's RxSC, by, among other things:

a.    reporting to and charging Plaintiff and the Ohio Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

b.    communicating to and charging beneficiaries of Plaintiff, consumers, and the Ohio Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

c.    concealing from Plaintiff and the Ohio Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper reimbursement amount Plaintiff and the Ohio Class should have paid; and

d.    wrongfully obtaining monies from Plaintiff and the Ohio Class as a result of its deception.

170.    Kroger willfully and knowingly engaged in the deceptive trade practices described above and knew or should have known that those practices were deceptive in violation of Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. §4165.02(A).

171.    The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the members of the Ohio Class about whether to pay for Kroger's prescription

46

drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's deceptive, fraudulent, false, and unfair acts and practices.

172.    Kroger intended for Plaintiff and the members of the Ohio Class to pay for prescription drugs in Kroger's RxSC in reliance upon Kroger's deceptive, fraudulent, false, and unfair acts and practices.

173.    As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the members of the Ohio Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

174.    Kroger is therefore liable to Plaintiff and the members of the Ohio Class for the damages they sustained, plus statutory damages, penalties, injunctive relief, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT XI**
**Violation of South Carolina's Unfair Trade Practices Act ("SCUTPA")**
**Asserted by Plaintiff on Behalf of South Carolina Members of the Nationwide Class**
**("South Carolina Class")**

175.    Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

176.    Plaintiff brings this claim on behalf of itself and the members of the South Carolina Class against Kroger.

177.    Plaintiff and the South Carolina Class are "persons" under the SCUTPA entitled to bring the action, which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity." S.C. Code Ann. §39-5-10(a).

178.    At all relevant times, Plaintiff and the South Carolina Class are members of the public, with respect to purchases of prescription drugs in Kroger's RxSC in South Carolina by

members of the South Carolina Class, in that the actions and transactions alleged herein substantially affected the people of South Carolina, with thousands of beneficiaries and consumers in South Carolina paying substantially higher prices for prescription drugs in Kroger's RxSC at South Carolina Kroger pharmacies.

179.    Kroger's transactions with Plaintiff and the South Carolina Class as described were done "in the conduct of any trade or commerce" within the meaning of S.C. Code Ann. §39-5-20(a).

180.    S.C. Code Ann. §39-5-140(a) states: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by Section 39-5-20 may bring an action . . . ."

181.    S.C. Code Ann. §39-5-20 defines unfair or deceptive conduct to include:

   a.    Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

182.    Plaintiff and South Carolina consumers paid for prescription drugs in Kroger's RxSC and suffered injury and ascertainable losses of money and property because of Kroger's employment of unfair or deceptive acts or practices by, among other things:

48

a. reporting to and charging Plaintiff and the South Carolina Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

b. communicating to and charging beneficiaries of Plaintiff and the South Carolina Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

c. concealing from Plaintiff and the South Carolina Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper amounts Kroger should have reported to and charged Plaintiff and the South Carolina Class; and

d. wrongfully obtaining monies from Plaintiff and the South Carolina Class as a result of its deception.

183. Kroger willfully and knowingly engaged in employment of the unfair or deceptive methods, acts or practices that were willful or knowing violations of S.C. Code Ann. §39-5-20.

184. The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the South Carolina Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's unfair and deceptive practices.

185. As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the South Carolina Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

186. Kroger is therefore liable to Plaintiff and the South Carolina Class for the damages they sustained, including treble damages and other relief as deemed necessary resulting from Kroger's willful or knowing violations of S.C. Code Ann. §39-5-20. Kroger is also liable for costs,

and reasonable attorneys' fees to the extent provided by law, in accordance with S.C. Code Ann. §39-5-140.

### COUNT XII
**Violation of the Tennessee Consumer Protection Act ("Tennessee CPA")**
**Asserted by Plaintiff on Behalf of Tennessee Members of the Nationwide Class**
**("Tennessee Class")**

187.    Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

188.    Plaintiff brings this claim on behalf of itself and the members of the Tennessee Class against Kroger.

189.    Plaintiff and the Tennessee Class are "persons" under the Tennessee CPA entitled to bring the action, which includes "natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." Tenn. Code Ann. §47-18-103(18).

190.    At all relevant times, Plaintiff and the Tennessee Class are members of the public, with respect to purchases of prescription drugs in Kroger's RxSC in Tennessee by members of the Tennessee Class, in that the actions and transactions alleged herein substantially affected the people of Tennessee, with thousands of beneficiaries and consumers in Tennessee paying substantially higher prices for prescription drugs in Kroger's RxSC at Tennessee Kroger pharmacies.

191.    Kroger's transactions with Plaintiff and the Tennessee Class as described were done "in the conduct of any trade or commerce" within the meaning of Tenn. Code Ann. §47-18-104(a).

192.    Tenn. Code Ann. §47-18-109 states: "Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive

act or practice described in §47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages."

193. Tenn. Code Ann. §47-18-104(b)(11) and (23) define unfair or deceptive conduct to include: "Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "misrepresenting the former price, savings, quality or ownership of any goods sold."

194. Plaintiff and Tennessee consumers paid for prescription drugs in Kroger's RxSC and suffered injury and ascertainable losses of money and property because of Kroger's employment of unfair or deceptive acts or practices by, among other things:

   a. reporting to and charging Plaintiff and the Tennessee Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

   b. communicating to and charging beneficiaries of Plaintiff and the Tennessee Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

   c. concealing from Plaintiff and the Tennessee Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper amounts Kroger should have reported to and charged Plaintiff and the Tennessee Class; and

   d. wrongfully obtaining monies from Plaintiff and the Tennessee Class as a result of its deception.

195. Kroger willfully and knowingly engaged in employment of the unfair or deceptive methods, acts or practices that were willful or knowing violations of Tenn. Code Ann. §47-18-104.

196.    The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the Tennessee Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's unfair and deceptive practices.

197.    As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the Tennessee Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

198.    Kroger is therefore liable to Plaintiff and the Tennessee Class for the damages they sustained, including treble damages and other relief as deemed necessary resulting from Kroger's willful or knowing violations of Tenn. Code Ann. §47-18-104. Kroger is also liable for costs, and reasonable attorneys' fees to the extent provided by law, in accordance Tenn. Code Ann. §47-18-109(e)(1).

## COUNT XIII
### Violation of the Indiana Deceptive Consumer Sales Act ("Indiana DCSA")
### Asserted by Plaintiff on Behalf of Indiana Members of the Nationwide Class
### ("Indiana Class")

199.    Plaintiff repeats each and every allegation contained in paragraphs above and incorporates such allegations by reference herein.

200.    Plaintiff brings this claim on behalf of itself and the members of the Indiana Class against Kroger.

243.    Plaintiff and the Indiana Class are "persons" under the Indiana DCSA entitled to bring the action, which includes "an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity." Ind. Code §24-5-0.5-2(a)(2).

52

201. At all relevant times, Plaintiff and the Indiana Class are members of the public, with respect to purchases of prescription drugs in Kroger's RxSC in Indiana by members of the Indiana Class, in that the actions and transactions alleged herein substantially affected the people of Indiana, with thousands of beneficiaries and consumers in Indiana paying substantially higher prices for prescription drugs in Kroger's RxSC at Indiana Kroger pharmacies.

202. The Indiana DCSA prohibits suppliers from committing acts or omissions that are unfair, abusive, or deceptive in connection with a consumer transaction; further, acts and omissions prohibited by the Indiana DCSA include both implicit and explicit misrepresentations. *See* Ind. Code §24-5-0.5-3(a).

203. Ind. Code §24-5-0.5-4 states: "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater."

204. Ind. Code §24-5-0.5-3(6) defines deceptive acts to include: "That a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not."

205. Plaintiff and Indiana consumers paid for prescription drugs in Kroger's RxSC and suffered injury and ascertainable losses of money and property because of Kroger's employment of unfair or deceptive acts or practices by, among other things:

a. reporting to and charging Plaintiff and the Indiana Class fraudulently inflated U&C prices for prescription drugs in Kroger's RxSC;

b. communicating to and charging beneficiaries of Plaintiff and the Indiana Class (or its beneficiaries) fraudulently inflated copayment, coinsurance, or deductible amounts that exceeded Kroger's true U&C price;

53

      c.   concealing from Plaintiff and the Indiana Class the true U&C prices of prescription drugs in Kroger's RxSC, and the proper amounts Kroger should have reported to and charged Plaintiff and the Indiana Class; and

      d.   wrongfully obtaining monies from Plaintiff and the Indiana Class as a result of its deception.

206.    Kroger willfully and knowingly engaged in employment of the unfair or deceptive methods, acts or practices that were willful or knowing violations of Ind. Code §24-5-0.5-3.

207.    The facts that Kroger misrepresented and concealed were material to the decisions of Plaintiff and the Indiana Class about whether to pay for Kroger's prescription drugs in Kroger's RxSC, in that they would not have proceeded with the transaction but for Kroger's unfair and deceptive practices.

208.    As a direct and proximate result of Kroger's deceptive, fraudulent, false, and unfair acts and practices, Plaintiff and the Indiana Class were deceived into paying artificially inflated prices for prescription drugs in Kroger's RxSC and have been damaged thereby.

209.    Kroger is therefore liable to Plaintiff and the Indiana Class for the damages they sustained, including treble damages and other relief as deemed necessary resulting from Kroger's willful or knowing violations of Ind. Code §24-5-0.5-3. Kroger is also liable for costs, and reasonable attorneys' fees to the extent provided by law, in accordance with Ind. Code §24-5-0.5-3(a).

<u>**NOTICE TO STATE ATTORNEYS GENERAL**</u>

210.    A copy of this Complaint was mailed to the Attorneys General of Georgia and South Carolina. *See* Ga. Code Ann. §10-1-399(g); S.C. Code Ann. §39-5-140(b).

54

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment in an amount to be determined at trial against Defendant, as follows:

A. That all members of the Class are owed at least the difference between the amount they paid and the U&C offered to the general public for all Kroger drugs purchased during the applicable liability period of the program;

B. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiff is a proper Class representative;

C. That the Court grant permanent injunctive relief to prohibit Kroger from continuing to engage in the unlawful acts, omissions, and practices described herein;

D. That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Kroger as a result of its unlawful acts, omissions, and practices;

F. That the Court award statutory treble damages, and punitive or exemplary damages, to the extent permitted by law;

G. That the unlawful acts alleged in this Complaint be adjudged and decreed to be a violation of the unfair and deceptive business acts and practices in violation of the consumer protection statutes alleged herein;

H. That the Court award to Plaintiff the cost and disbursements of the action, along with reasonable attorneys' fees;

I.     That the Court award pre- and post-judgment interest at the maximum legal rate;

and

J.     That the Court grant all such other relief as it deems just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands a trial by jury on all claims so triable.

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

DATED: March 19, 2026

*/s/ Geoffrey M. Johnson*
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Tel.: (216) 229-6088
Fax: (216) 229-6092
gjohnson@scott-scott.com

Joseph P. Guglielmo (*pro hac vice* forthcoming)
Donald A. Broggi (*pro hac vice* forthcoming)
Michelle E. Conston (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-4478
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
mconston@scott-scott.com

Erin Green Comite (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-531-2632
Facsimile: 860-537-4432
ecomite@scott-scott.com

Jacqueline A. Kelly (*pro hac vice* forthcoming)

Lyndsey K. Bates (*pro hac vice* forthcoming)
**ASHERKELLY, PLLC**
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone: 248-746-2748
jkelly@asherkellylaw.com
lbates@asherkellylaw.com

Joshua D. Arisohn (*pro hac vice* forthcoming)
**ARISOHN LLC**
94 Blakeslee Rd.,
Litchfield, CT 06759
Telephone: 917-656-0569
josh@arisohnllc.com

*Attorneys for Plaintiff*

57